Patrick D. Bonner, Jr.
MENZ BONNER KOMAR & KOENIGSBERG LLP
125 Half Mile Road, Suite 103
Red Bank, New Jersey 07701
Tel.:    (732) 758-1200
Fax:    (732) 758-1204
pbonner@mbkklaw.com

David A. Koenigsberg
(Not admitted in New Jersey)
MENZ BONNER KOMAR & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
Tel.:    (212) 223-2100
Fax:    (212) 221-2185
dkoenigsberg@mbkklaw.com

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

-------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| SHANE SHACKFORD, | | Civil Action No. 12-_____ (___) |
| | : | |
| Plaintiffs, | | **COMPLAINT FOR VIOLATION** |
| | : | **OF FALSE CLAIMS ACT** |
| | | |
| -v- | : | **FILED UNDER SEAL** |
| | | **Pursuant to 31 U.S.C. § 3730(b)(2)** |
| PUBLIC CONSULTING GROUP, INC., | : | |
| GREATER EGG HARBOR REGIONAL | | |
| HIGH SCHOOL DISTRICT, | : | |
| GLOUCESTER TOWNSHIP SCHOOL | | |
| DISTRICT and DEFENDANTS LISTED | : | |
| IN APPENDIX A, | | |
| | : | |
| Defendants. | | |

-------------------------------------------------------x

Plaintiff-Relator Shane Shackford, through his attorneys Menz Bonner

Komar & Koenigsberg LLP, for his complaint against Public Consulting Group, Inc.,

Greater Egg Harbor Regional High School District and Gloucester Township School

District and the defendants listed in Appendix A, alleges, based upon personal

knowledge, relevant documents, and information and belief, as follows:

## I. JURISDICTION, VENUE AND THE PARTIES

1.      Relator Shane Shackford ("Relator") is a resident of the State of New Jersey.  Beginning in July 2008 through the present, Relator has been employed by defendant Greater Egg Harbor Regional High School District as a school psychologist for Absegami High School, Galloway Township, Atlantic County, New Jersey.  From this position, Relator has learned that the defendants have been submitting false claims to the New Jersey Medicaid program for school-based health services provided to students pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400. Relator brings this action on behalf of himself as well as on behalf of the United States for violations of the federal False Claims Act, 31 U.S.C. §§ 3729-3733.

2.      Defendant Public Consulting Group, Inc. ("PCG"), a Massachusetts corporation, is a management consulting firm that offers, among other things, systems development, revenue maximization and management advisory services to government and private health and human services providers throughout the United States.  Over 95% of PCG's clients are public sector agencies, such as school districts, county and state education, social service and Medicaid departments and agencies.

3.      Defendant Greater Egg Harbor Regional High School District ("GEHRHSD") is a public school district, with administrative offices located at 1824 Dr. Dennis Foreman Drive, Mays Landing, Atlantic County, New Jersey 08330-2640. GEHRHSD operates Absegami, Oakcrest and Cedar Creek High Schools.

4.      Defendant Gloucester Township operates 11 public elementary and middle schools.  The Gloucester Township Public Schools have administrative offices

located at Administration Building, 17 Erial Road, Blackwood, Camden County, New Jersey  08012. The other defendants listed in the caption and in Appendix A to this Complaint are the New Jersey school districts that have submitted claims for reimbursement for school-based health services as explained below.  GEHRHSD, Gloucester Township and the New Jersey School district listed on Appendix A are sometimes collectively referred to as the "Local Education Agency Defendants."

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. §§ 3729, 3730(b) and 3732 in that the claims for relief in this action arise under the laws of the United States and are brought in the name of the United States.

6.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) which provides that service of process may be made "at any place within or outside the United States" and because one or more of the defendants can be found in, resides and/or transacts business in this judicial district.

7.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because one or more of the defendants can be found in, resides and/or transacts business in this district.  At all times relevant to this Complaint, one or more defendants regularly conducted substantial business within this district and maintained employees and offices in this district.  In addition, statutory violations, as alleged herein, occurred in this district.

8.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" described in this Complaint.  In addition, Relator is the original source of the allegations made in this Complaint in that

he has direct and independent knowledge of the matters set forth herein.

9. Prior to filing the instant qui tam Complaint, relator voluntarily provided the information described in his Complaint to the United States.

## II. FACTUAL BACKGROUND

### A. Medical Services Provided To Students With Individualized Education Plans May Be Eligible For Medicaid Reimbursement

10. Under Title XIX of the Social Security Act, the Medicaid program provides medical assistance to certain poor persons and persons with disabilities. The Federal and State governments jointly fund and administer the Medicaid program. At the federal level, the Centers for Medicare & Medicaid Services ("CMS") administer the program. Each state administers its Medicaid program according to a CMS-approved state plan. Although a state has flexibility in designing and operating its Medicaid program, the State must comply with federal requirements to receive federal funding.

11. In 1988, Congress amended the law to permit Medicaid payments for medical services provided to children under the Individuals with Disabilities Education Act ("IDEA"). Specifically, the Medicare Catastrophic Coverage Act of 1988, § 411(k) (13), P.L. No. 100-360, amended Social Security Act § 1903(c), 42 U.S.C. § 1396b(c). Under this amendment, payment is permitted "for medical assistance for covered services furnished to a child with a disability" even if such service is included in the child's Individual Education Plan established under IDEA, 20 U.S.C. § 1411.

12. "Medical assistance" is defined by Social Security Act § 1905(a), 42 U.S.C. § 1396d(a), to include physicians' services furnished by a physician, 42 U.S.C. § 1396d(a)(5)(A), and "medical care, or any other type of remedial care recognized under

- 4 -

State law, furnished by licensed practitioners within the scope of their practice as defined by State law."  42 U.S.C. § 1396d(a)(6).

13.     The IDEA defines "Individual Educational Plan" or IEP as "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child …."  20 U.S.C. § 1414(d) (1) (A) (IV).  The statute defines "related services" to include "medical services, except that such medical services shall be for diagnostic and evaluation purposes only," that are required "to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

14.     Federal and state rules require school-based health services to be (1) referred or prescribed by a physician or another appropriate professional, (2) provided by an individual who meets federal qualification requirements, (3) fully documented, (4) actually furnished in order to be billed, and (5) documented in the child's plan.

15.     In August 1997, CMS issued a guide entitled *Medicaid and School Health: A Technical Assistance Guide* ("Technical Guide").  According to the Technical Guide, school-based health services included in a child's plan may be covered if all relevant statutory and regulatory requirements are met.  The Technical Guide provided that a state may cover services included in a child's plan as long as: (1) the services are listed in § 1905(a) of the Act and are medically necessary; (2) all federal and state regulations are followed, including those specifying provider qualifications; and (3) the services are included in the state plan.   Covered services may include, but are not limited to, physical therapy, occupational therapy, speech pathology/therapy services, psychological counseling, nursing, and transportation services.

16.     According to the Technical Guide, Medicaid reimbursement for

evaluation related medical services is available under certain circumstances.

> [I]f medical evaluations or assessments are conducted to determine a
> child's health-related needs for purposes of the IEP/IFSP, payment for
> some or all of the costs may be available under Medicaid.  However, if the
> evaluations or assessments are for educational purposes, Medicaid
> reimbursement is not available.  Medicaid payment is only available for
> the part of the assessment that is medical in nature and provided by
> qualified Medicaid providers.

Technical Guide at 14-15.   The Technical Guide further states:

> [H]ealth-related services included in a child's IEP … can be covered
> under Medicaid if all relevant statutory and regulatory requirements are
> met.  A state may cover services often included in an IEP … as long as:  1)
> the services are medically necessary and coverable under a Medicaid
> coverage category (speech therapy, physical therapy, etc.), 2) all other
> Federal and state regulations are followed, including those for provider
> qualifications, comparability of services and the amount, duration and
> scope of provisions; and 3) the services are included in the state plan ….

Technical Guide at 15.

17.     In 2003, CMS issued the *Medicaid School-Based Administrative*

*Claiming Guide* (May 2003) (the "2003 Guide").  This guide provides as follows:

> For Medicaid to cover school-based services, they must be primarily
> medical and not educational in nature.  The services must be provided by a
> qualified Medicaid provider to children in families that meet Medicaid
> income eligibility requirements.  And they must be considered medically
> necessary for the child.  The services can include:
>
> - routine and preventive screenings and examinations;
> - diagnosis and treatment of acute, uncomplicated problems;
> - monitoring and treatment of chronic medical conditions;
> and
> - provision of medical services to children with disabilities
> under the IDEA.

2003 Guide at 50.  The 2003 Guide further provides that "Medicaid does not pay for the

IEP team meetings or for costs related to attendance at those meetings by medical

professionals."  2003 Guide at 56.

> The development of an IEP is a requirement of the IDEA, the primary
> purpose of which is to facilitate the child's education.  Because it is an
> education requirement, Medicaid does not pay for the administrative
> activities associated with the development of the IEP.  Once the IEP is
> established and implemented, however, Medicaid can pay for
> administrative activities that are directly related to the provision of those
> Medicaid covered services that are identified in the IEP, and which are
> furnished to Medicaid eligible children.
>
> The school district is mandated to review the IEP periodically, but not less
> than annually, and, if needed, to revise the program to address any lack of
> expected progress toward individually defined goals, or to address the
> results of a re-evaluation of the child.  The IEP can be revised at any time
> if the child is not making expected progress or if new factors arise.
>
> These activities are for the purpose of fulfilling education-related
> mandates under the IDEA.  As such, the associated costs of these activities
> are not allowable as administrative costs under the Medicaid program.

2003 Guide at 56-67.

18.     Under these rules, if a school conducts an IEP meeting for the

purpose of fulfilling education-related mandates under IDEA, the costs associated with

that meeting are not allowed as administrative costs under the Medicaid program.  2003

Guide at 18.   Because the development, coordination and evaluation of the IEP are

considered school-related activities, they are not reimbursable by Medicaid.  2003 Guide

at 26.

**B.**     __New Jersey's Special Education Medicaid Initiative__

          19.    In New Jersey, the Department of Human Services operates New Jersey's Medicaid Plan.  Within the Department of Human Services, the Division of Medical Assistance and Health Services administers the Medicaid program.  The administrative responsibility for operating New Jersey's school-based health services program, known as the Special Education Medicaid Initiative ("SEMI"), is shared among three State departments:  Human Services, Education and Treasury.  The purpose of the SEMI program is to enable New Jersey to obtain federal funding for providing medical services to Medicaid eligible students in New Jersey's schools.  "SEMI allows both the state and the local school districts to receive federal dollars to offset the cost of providing medical services . . . to Medicaid eligible children in the schools."  Letter to School Administrators from New Jersey Departments of Treasury and Education re SEMI (June 11, 2003).  "The SEMI program provides the LEAs and the State of New Jersey a source of revenue through federal Medicaid Title XIX funds."  Letter to Superintendents, Directors of Special Services, and SEMI Coordinators of New Jersey Local Education Agencies (LEAs) from New Jersey Department of the Treasury (Nov. 2, 2007).

          20.    New Jersey's SEMI program provides that a school-based health program may provide rehabilitative services, evaluation services and transportation services.  Evaluation services identify the need for school-based health services and prescribe the range and frequency of services that the student requires.  The state's Provider Handbook for the Special Education Medicaid Initiative (Feb. 2011) ("N.J. Handbook") states:

> LEAs [Local Education Agency] may bill Medicaid for providing
> medically necessary health services to students.  Health services required

> in the student's IEP are considered to be medically necessary for Medicaid
> billing purposes. Services provided to determine the student's need for an
> IEP, such as evaluations, are also reimbursable by Medicaid.  To be
> reimbursed by Medicaid, the services must also be properly documented
> and provided by qualified personnel as described in the Handbook.
> Medicaid-covered school-based health services include:  . . . .
> B. Evaluation services to determine a student's health care needs.

N.J. Handbook at 10.  The "SEMI Handbook … outlines all the requirements that must

be met for a school to receive the federal dollars generated under SEMI."  Letter to

School Administrators from New Jersey Departments of Treasury and Education re

SEMI (June 11, 2003).

21.     Evaluation services include initial evaluations, reevaluations, and

annual reviews.  These services are defined by Department of Education regulations as

follows:

> Medicaid reimbursement is available for the medical component of the
> evaluation services when provided by qualified clinical practitioners as
> described in this Handbook.  Evaluation services identify the need for
> specific services and the evaluation results are used to develop the
> student's IEP, which prescribes the range and frequency of services the
> student needs in order to have access to a free and appropriate public
> education.

New Jersey Administrative Code ("NJAC") § 6A:14-3; Handbook at 11-12.

22.     Under New Jersey's approved Medicaid plan, Medicaid

reimbursement is possible if there is a medical component of the evaluation services to

develop the IEP.  N.J. State Plan, Addendum to Attachment 3.1-A, page 13(d).1 (listing

covered evaluation services for school based Rehabilitative Services (Special

Education)); *see also* Attachment 4.16-A, Page 3 (School-Based Rehabilitative Services)

(the "State agency has cooperative arrangements with the New Jersey Department of

Education to permit reimbursement for certain *medical services* provided to Medicaid-

eligible children in school settings pursuant to Part B of the federal Individuals with Disabilities Education Act.") (Emphasis added).

23.     New Jersey's SEMI mandates that a school district "shall take appropriate steps to maximize its revenue from the … [SEMI] Program by following the policies and procedures to maximize participation in the program …."  NJAC § 6A:23A-5.3(a).  The SEMI regulations require local school districts to include in their annual budget estimates a projection of available SEMI reimbursement for the budget year as determined by the State Treasury Department's third party administrator for SEMI.  "The projection shall be based on the number of Medicaid eligible students; the assumption of 20 services per eligible student per year; one IEP meeting per eligible student per year; and applicable SEMI reimbursement rates."  NJAC § 6A:23A-5.3(c).  As of the 2009-2010 school year, a "district shall recognize as revenue in its annual district budget no less than 90 percent of said projection."  NJAC § 6A:23A-5.3(c) (1).  The districts "shall strive to achieve maximum participation in the SEMI program", which is defined to mean "obtaining a 90 percent return rate of parental consent forms for all SEMI eligible students."  NJAC § 6A:23A-5.3(d).

24.     If a school district fails to meet the benchmark in a given year, it must develop a SEMI action plan.  NJAC § 6A:23A-5.3(g).  The components of the SEMI action plan shall include "procedures to ensure that all IEP meetings are documented in the third-party administrator's system.  IEP's are only claimable if a Medicaid qualified practitioner is present."  NJAC § 6A:23A-5.3(g) (3).

25.     In the event that a district falls below the 90 percent parent consent target and does not demonstrate implementation of the Education Department's approved

SEMI action plan, the district "shall be subject to review for the withholding of State aid by the Commissioner … in an amount equal to the SEMI revenue projection based on their approved benchmark for the budget year, … less actual SEMI reimbursements for the budget year."  NJAC § 6A:23A-5.3(h).

C.    **PCG's Administration Of The SEMI Program**

26.    In 2005, New Jersey contracted with PCG to be the vendor to provide billing services for school-based health services program on behalf of New Jersey's local school districts.  PCG is not paid directly with federal Medicaid funds. Instead, New Jersey pays PCG a percentage of the federal Medicaid reimbursements made to New Jersey's SEMI program.  *See* Review of New Jersey's Medicaid School-Based Health Claims Submitted by Public Consulting Group, Inc., HHS OIG Audit Report at 2 n. 1, A-02-07-01052 (Sept. 14, 2010).  Beginning October 1, 2005, school districts started using PCG's Easy TRAC web based billing system to document related services, such as occupational therapy, speech therapy, and counseling, and evaluations, when delivered by Medicaid qualified practitioners.

27.    PCG conducts semi-annual meetings to provide training and instruction to school district personnel about the requirements for the SEMI program.  As part of these training seminars, PCG issues written materials that describe the SEMI program for the LEA officials and that summarize the requirements of the applicable regulations.  According to PCG, the purpose of the SEMI program "is to recover a portion of costs for certain Medicaid covered services provided to Medicaid-eligible special education students enrolled in participating Local Education Agencies (LEAs) …."  PCG Brochure entitled "New Jersey SEMI/A-5 Regulations" at 3 (Aug. 25, 2008).

"Federal Medicaid revenue is available through the SEMI program *only when* Federal and State Medicaid requirements are met." *Id.* (emphasis in original).  According to PCG, during the 2008 fiscal year, the SEMI Rates paid school districts for "IEP (Evaluation) Meetings = $276.75 per IEP Meeting" and for "Direct (Related) Services = $9.59 per date of service." *Id.* at 5.

28.     According to the written materials provided by PCG for the New Jersey SEMI Regional Meeting held November 12-14, 2008, the rates increased to $9.91 for Direct Services and $285.91 per IEP Meeting. PCG Brochure at 4 (Nov 12-14, 2008). PCG advised the school district representatives that "The date of the IEP Meeting constitutes the claimable evaluation service." *Id.* at 10.  Nowhere in either the August 2008 or November 2008 materials did PCG explain that there had to be a medical component to the evaluations conducted in connection with the IEP meetings in order to bill Medicaid.

29.     The brochure that PCG distributed for the November 2009 SEMI Regional Meeting emphasized that 50% of the districts' revenues derived from the IEP meetings and compared the $10.16 of revenue per direct service to the $293.22 of revenue to be earned from each IEP meeting.  PCG Brochure at 6 (Nov. 2009).  For the April 2010 Regional Meeting, PCG told the school districts that the IEP meetings generated 50-60% of the revenues and were "[c]ritical for reaching revenue benchmarks." PCG Brochure at 11 (April 2010).  To further drive home the point, the brochure compared the revenues from IEP meetings to direct services as follows:  "1 IEP Meeting = $293.22; 20 Direct Services = $203.20." *Id.*  By the time of the March 2011 Regional Meeting, PCG's written materials stated that "Most districts will realize the majority of

their SEMI revenue this spring due to increased number of IEP meetings."  PCG
Brochure at 16 (March 2011).  PCG then advised that one IEP meeting equals $298.09 to
the District while 18 Direct Services equal $185.94 in revenue to the District. *Id.*  None
of these brochures instructs the school districts that there had to be a medically related
aspect of the IEP process in order to be able to bill Medicaid for the IEP meeting.

30.    PCG's written materials do not inform the school districts that an
IEP is billable for Medicaid purposes only when the IEP involved an evaluation to
determine a student's health care needs.

**D.    Defendants Have Violated The Rules Attendant To
        Billing Medicaid For Providing Health Services To Students
        Eligible For Individualized Education Plans And Continue To Do So**

31.    According to PCG, it "has served the State of New Jersey since
2005 and, since then, has increased the state's federal Medicaid revenues by nearly 300
percent."  *New Jersey Awards Contract Extension to PCG Education*, PCG Press Release
(Apr. 7, 2011).  PCG has encouraged school districts throughout New Jersey to bill for
IEP meetings that did not include an evaluation to determine the student's health care
needs.  PCG has also encouraged and caused school districts throughout New Jersey to
submit claims to Medicaid for IEPs for almost any IDEA student who is eligible for
Medicaid without regard for whether there is a medical purpose for the evaluation or the
IEP.  This occurs in several ways, as Relator has observed in his school district.

32.    As a school psychologist certified by New Jersey's Department of
Education, Relator is one of the Medicaid eligible providers in his school.  In that
capacity, if he provides psychological counseling to a student that is required by an IEP
set up pursuant to IDEA, his services, may, under the appropriate circumstances, be
reimbursable by Medicaid.   Relator has observed, however, that GEHRHSD bills

Medicaid for his services for students who are not receiving psychological counseling from Relator, for IEP meetings relator has not attended, or for IEP meetings which had no medical component.

33.     As set forth above, IEP meetings are conducted for a student for an initial meeting, for reevaluations, annual reviews or when necessary to revise a student's plan.

34.     Relator has observed in many instances that when initial IEP meetings are held, GEHRHSD billed for initial IEP meetings for students in need of educational services under IDEA, but who had no medical issues that would justify billing Medicaid for the IEP meeting, even when he attended the meeting.  Relator has also observed instances when GEHRHSD billed for IEP meetings when the student was not receiving any related services under the IEP that were reimbursable by Medicaid.

35.     Relator also became aware that GEHRHSD conducts and bills Medicaid for IEP meetings for senior students in the few months before graduation.  New Jersey's special education regulations require that every senior receive a summary of performance when graduation is approaching because graduation would constitute a change in placement.  *See* N.J. Admin. Code § 6A:14-4.11.   The student shall be provided a written summary of his/her academic achievement and functional performance before the date of graduation with recommendations to assist the student in meeting postsecondary goals.  § 6A:14-4.11(b)(4).   The required summary of performance is not the equivalent of an IEP and is not reimbursable by Medicaid.

36.     Nevertheless, GEHRHSD purports to conduct IEPs for students eligible to graduate and bills Medicaid for such meetings.  In February 2011, Relator

attended a meeting of the Child Study Team for the entire GEHRHSD conducted by John Ragan, the District Supervisor of Special Services.   Among other matters discussed at the meeting, Ragan instructed the Child Study Team to prepare an IEP for soon to be graduating seniors by just preparing a new cover page.   The student and a teacher would be asked to sign the cover sheet to create a false record that an IEP meeting was held and that the student's IEP team had been invited to attend, when in fact no such invitation was sent nor such a meeting held.   While the school was required to provide the senior student with a summary of performance, the school district was using that requirement as an occasion to conduct an IEP meeting that could be billed to Medicaid, when in fact no IEP meeting was held.   Relator understood that the only reason Ragan instructed the Child Study Team to create the IEP cover sheet was to create the basis for a Medicaid claim.

37.     Relator has observed many instances where the school conducted an IEP meeting for a student during the Spring term and billed for such meeting, but then later reported a date for the IEP meeting that coincided with the beginning of the following September's term to qualify for Medicaid billing even though no meeting occurred in September or such meeting, if it occurred, was unnecessary.   It appears in many instances that the school district billed Medicaid for both the spring and September IEPs, even though both plans covered the same time period for the new school year.   A review of claims submitted by GEHRHSD will show that in many instances, IEPs for numerous students occurred on September 1 of a new school year, even when the student was the subject of an IEP meeting during the spring of the prior school term that resulted in the development of an IEP document.   Clearly, GEHRHSD was using the start of the

new school year as an excuse to purportedly hold an IEP meeting for the sole purpose of billing Medicaid.

38.     Relator has been instructed and understands that a student's case manager is the only person who is supposed to enter data with regard to the conduct of IEP meetings for billing purposes.  Relator has observed on many occasions that claims for IEPs and related services have been entered into the computer system under his name for students he has not treated or for meetings he never attended.   When he has become aware of such claims, he has taken steps to have those claims removed and withdrawn. He also caused other claims to be removed and withdrawn when he learned that claims have been made for services not rendered or were otherwise improper or unsupportable.

39.     Relator has also learned that claims for IEP meetings were submitted to Medicaid that falsely represented that the meetings were attended by school personnel who no longer worked for GEHRHSD at the time the meeting purportedly took place.

40.      Relator also has knowledge that in the Gloucester Township School District, members of the school psychology staff have been directed to attend as many IEP meetings as possible, even when the staff psychologist had no prior relationship or knowledge of the student who was the subject of the IEP meeting.

41.     PCG is responsible for making sure that claims submitted for Medicaid reimbursement are lawful and in compliance with all federal and state rules, regulations and requirements for billing Medicaid for IDEA services.  PCG, however, has failed to ensure that the claims for Medicaid reimbursement submitted by the local school districts are eligible for Medicaid and in fact has encouraged school districts across New

Jersey to submit claims for IEP meetings that do not comply with the federal rules for Medicaid coverage.

42.     The following are examples of false claims submitted to Medicaid for IEP meetings that were not eligible for reimbursement by Medicaid.

(a)     Student No. 1 at Absegami High School was the subject of IEP meetings conducted on May 14, 2009, April 12, 2010 and March 14, 2011, which were submitted to Medicaid.  This student had no medically related disabilities.  In addition, while the school claimed he received psychological counseling, Relator, the only psychologist employed at Absegami High School, had not provided medically necessary psychological counseling to such student during the relevant time periods.

(b)     Student No. 2 at Absegami High School was the subject of IEP meetings conducted on May 12, 2009, April 28, 2010 and March 14, 2011, which were all billed to Medicaid. This student had no medically related disabilities and did not receive any related services.

(c)     Student No. 3 had claims submitted by GEHRHSD for IEP meetings purportedly held on each of September 1, 2010 and 2011 under the name of team leader Denise Sorrentino, a social worker.  Ms. Sorrentino left the school district at the end of June 2010 to work at the Chatham, N.J. school district, where she remains employed under her married name Caamano.

(d)     Student No. 4 at Absegami High School was the subject of claims for an IEP meeting on September 1, 2010, under the name of team leader Cori Koury, social worker, even though Ms. Koury's employment with the school district was terminated for the 2010-2011 school year due to a reduction in force.  Ms. Koury was

rehired in July 2011 for the 2011-2012 school year to work at Cedar Creek High School. In addition, a claim for an IEP for Student No. 4 was submitted for a meeting held on September 7, 2010, under the name of a different social worker.  In essence, this student was the subject of two IEPs for the same school year.

        (e)      Student No. 5 at Absegami High School was the subject of IEP meetings held on September 2, 2009, May 12, 2010, September 2, 2010 and September 1, 2011.  The student's IEP did not require that the student receive any related services, yet the claims to Medicaid for the IEP meetings stated that the student was to receive related services in the form of Social Work Services.

        (f)      Student No. 6 at Absegami High School was the subject of IEP meetings held on May 6, 2009, September 2, 2009, April 27, 2010, September 2, 2010, and September 1, 2011.  As with student No. 5, the student's IEP did not require that the student receive any related services, yet the claims to Medicaid for the IEP meetings stated that the student was to receive related services in the form of Social Work Services.

        (g)      Student No. 7 at Oakcrest High School was the subject of IEP meetings held on March 31, 2009, September 1, 2009, March 22, 2010, September 1, 2010 (twice), March 16, 2011and  September 1, 2011.   The September 2010 and September 2011 meetings were billed under the name of Kathleen Price, a social worker who left the district at the end of June 2010.  In addition, the student graduated in June 2011, yet an IEP meeting was purportedly held on March 16, 2011, which coincided with the student's senior summary of performance. The claims also stated that the student was receiving related services in the form of psychological counseling and social work, when

neither of those services was listed in the student's IEP.

      (h)    Student No. 8 at Oakcrest High School was the subject of IEP meetings held on March 30, 2009, September 1, 2009, September 1, 2010, March 16, 2011 and September 1, 2011.   The 2010 and 2011 meetings were billed under the name of Kathleen Price, who left the district as of June 2010. In addition, while the March 30, 2009 IEP covered the period from March 30, 2009 through March 30, 2010, another meeting was conducted on September 1, 2009 to cover through the end of June 2010. The September 1, 2009 meeting was held, if at all, solely to bill Medicaid.

      (i)    Student No. 9 at Absegami High School was the subject of IEP meetings held on April 16, 2009, May 10, 2010 and August 31, 2020.  The Medicaid claims included psychological and social work services, even though the student's IEP did not include either service as part of the plan.  Relator, without direction or knowledge of other school officials, caused one of the claims to be withdrawn as he did not provide the psychological services that were claimed.

      (j)    Student No. 10 at Absegami High School was the subject of IEP meetings held on April 28, 2009, September 1, 2009, September 2, 2009, May 21, 2010, August 31, 2010, and March 16, 2011.   The school district double billed Medicaid for the two September 2009 IEPs and for the March 16, 2011 IEP conducted during the student's senior year at the time of the summary evaluation required for graduating students.

      (k)    Student No. 11 at Absegami High School was the subject of IEP meetings held on May 13, 2009, September 2, 2010 and September 1, 2011.  In May 2009, however, the student attended Gloucester Township Middle School, which

conducted the IEP, but a Medicaid claim for that meeting was submitted by and in the name of Absegami High School.

(l)        Student No. 12 at Absegami High School was the subject of IEP meetings on September 1, 2010, March 22, 2011 and September 1, 2011.  Claims were made for psychological and social services, but neither was required by the IEP.

(m)        Student No. 13 was the subject of Medicaid claims by the Central Office of GEHRHSD for IEP meetings dated January 23, 2009, March 6, 2009, March 24, 2009, March 27, 2009 and April 2, 2009 and related psychological services under Relator's name.  These claims were improper because for the 2008-2009 school year, Student 13 was in prison at the Atlantic Youth Center – Harborfield, a juvenile detention center.   Relator was assigned responsibility for this student's file in September 2009. Relator subsequently took steps to have those claims withdrawn.

43.        The foregoing examples are provided for illustrative purposes only and are representative of the types of claims that are being submitted to Medicaid for federal reimbursement in school districts across the state.

44.        As set forth above, New Jersey provides each school district with a budget number based on the number of Medicaid eligible students in the district multiplied by the revenue that would be expected from providing each student with one IEP per year and 20 related services.  According to data published by the state, during Fiscal Year 2011, numerous school districts exceeded their projected revenue numbers, with some districts collecting as much as double the revenue target set by the state.  As set forth below, approximately 130 New Jersey school districts exceeded the state's revenue target by 20% or more for the 2011 fiscal year:

| | |
|---|---|
| **Atlantic County** | |
| Egg Harbor Township | 145.1% |
| Galloway Township | 183.2% |
| | |
| **Atlantic County** | |
| Egg Harbor Township | 145.1% |
| Galloway Township | 183.2% |
| Buena Regional | 121.7% |
| Galloway TWP | 183.2% |
| Hamilton  TWP | 171.7% |
| Pleasantville City | 144.1% |
| Somers Point City | 210.5% |
| | |
| **Bergen County** | |
| Bogota Boro | 145.3% |
| Dumont Boro | 156.4% |
| Lodi Borough | 134.0% |
| Lyndhurst TWP | 161.5% |
| Ridgefield Park | 161.8% |
| | |
| **Burlington County** | |
| Burlington TWP | 135.6% |
| Delran TWP | 182.1% |
| Lumberton TWP | 130.6% |
| Maple Shade TWP | 129.9% |
| Moorestown TWP | 133.6% |
| Mount Holly TWP | 150.4% |
| Mount Laurel TWP | 226.1% |
| Pemberton TWP | 140.4% |
| | |
| **Camden County** | |
| Clementon Boro | 122.0% |
| Gloucester City | 146.9% |
| Gloucester TWP | 162.2% |
| Lindenwold Boro | 197.5% |
| Mount Ephraim Boro | 135.5% |
| Pennsauken TWP | 161.5% |
| Runnemede Boro | 185.1% |
| Waterford TWP | 279.9% |
| Woodlynne | 208.5% |

| | |
|---|---|
| **Cape May County** | |
| Dennis TWP | 125.0% |
| Lower TWP | 150.8% |
| | |
| **Cumberland County** | |
| Bridgeton City | 135.3% |
| Downe TWP | 223.2% |
| Upper Deerfield TWP | 122.0% |
| | |
| **Essex County** | |
| Belleville Town | 170.5% |
| City of Orange TWP | 143.0% |
| Irvington Township | 147.9% |
| Lady Liberty Academics | 285.9% |
| Montclair Town | 141.5% |
| Team Academy Charter SCHO | 237.7% |
| West Orange Town | 124.6% |
| | |
| **Gloucester County** | |
| Elk TWP | 140.7% |
| Glassboro | 165.9% |
| Monroe TWP – Gloucester CO | 142.4% |
| Paulsboro BORO | 149.0% |
| Woodbury City | 167.7% |
| | |
| **Hudson County** | |
| Bayonne City | 171.1% |
| Harrison Town | 141.7% |
| Hoboken City | 138.8% |
| Hudson County Voc. | 121.8% |
| Jersey City | 138.3% |
| Kearny Town | 164.1% |
| Learning Community | 157.4% |
| North Bergen TWP | 126.5% |
| Secaucus Town | 169.6% |
| Union City | 165.7% |
| West New York Town | 194.1% |
| | |
| **Hunterdon County** | |
| Kingwood TWP | 159.2% |

| | |
|---|---|
| **Mercer County** | |
| East Windsor Regional | 182.1% |
| Ewing TWP | 140.3% |
| Lawrence TWP | 122.4% |
| | |
| **Middlesex County** | |
| Dunellen Boro | 239.7% |
| East Brunswick TWP | 169.0% |
| Middlesex Boro | 130.3% |
| Middlesex CO Vocational | 137.8% |
| New Brunswick City | 122.1% |
| North Brunswick TWP | 145.9% |
| Old Bridge TWP | 192.1% |
| Perth Amboy City | 190.2% |
| Piscataway TWP | 145.7% |
| Sayreville Boro | 128.4% |
| South Brunswick TWP | 148.9% |
| South Plainfield Boro | 149.8% |
| South River Boro | 159.4% |
| Spotswood Boro | 121.6% |
| Woodbridge TWP | 172.4% |
| | |
| **Monmouth County** | |
| Asbury Park City | 155.8% |
| Belmar | 129.8% |
| Eatontown Boro | 136.3% |
| Freehold Boro | 120.5% |
| Hazlet TWP | 211.0% |
| Holmdel TWP | 155.0% |
| Howell TWP | 133.4% |
| Keansburg Borough | 139.8% |
| Keyport Boro | 188.2% |
| Long Branch City | 131.4% |
| Middletown TWP | 225.7% |
| Neptune TWP | 139.4% |
| Ocean TWP | 177.4% |
| | |
| **Morris County** | |
| Boonton Town | 121.6% |
| Butler Boro | 147.9% |
| Morris School District | 122.0% |
| Mount Olive TWP | 140.7% |

| | |
|---|---|
| **Ocean County** | |
| Brick TWP | 141.3% |
| Lakehurst Boro | 262.3% |
| Lakewood TWP | 210.3% |
| Manchester TWP | 134.0% |
| Plumsted TWP | 133.0% |
| Point Pleasant | 250.7% |
| Souther Regional | 133.5% |
| Stafford TWP | 187.8% |
| | |
| **Passaic County** | |
| Bloomingdale Boro | 190.7% |
| Clifton City | 133.1% |
| Little Fall TWP | 126.2% |
| Passaic City | 165.8% |
| Passaic County Vocational | 147.3% |
| Prospect Park Boro | 171.4% |
| Totowa | 278.6% |
| West Milford TWP | 222.4% |
| | |
| **Salem County** | |
| Salem City | 138.7% |
| Woodstown Pilesgrove | 141.2% |
| | |
| **Somerset County** | |
| Sound Brook Boro | 152.7% |
| Somerville Boro | 186.4% |
| | |
| **Sussex County** | |
| Montague TWP | 195.1% |
| Stillwater TWP | 165.5% |
| Sussex Wantage Regl. | 143.7% |
| | |
| **Union County** | |
| Elizabeth City | 156.8% |
| Hillside TWP | 183.1% |
| Linden City | 146.1% |
| Plainfield City | 146.3% |
| Rahway City | 139.8% |
| Roselle Boro | 146.1% |
| Roselle Park Boro | 149.3% |
| Scotch Plains-Fanwood | 148.4% |

| Summit City | 209.0% |
|---|---|
| Union TWP | 152.7% |
| **Warren County** | |
| Lopatcong TWP | 194.2% |
| Mansfield | 207.2% |

Each of these school districts is overbilling Medicaid for IEPs and related services that were not medically necessary or were not provided.

### E.   PCG Is Causing Local Education Providers Throughout The United States To Submit False Claims For Medicaid Reimbursement For IEP Meetings

45.   PCG provides Medicaid billing guidance and services to governmental agencies throughout the United States to obtain Medicaid reimbursement in connection with services provided to students under IDEA.  The governmental agencies include but are not limited to the following states and school districts across the United States:

Florida: School Board of Broward County;

Georgia Children Intervention School Services Office;

Cobb County Schools;

Illinois: Chicago Public Schools;

Minnesota: Saint Paul Public Schools;

North Carolina School Systems;

Charlotte-Mecklenburg Schools;

Durham County Schools;

Wake County Schools;

Tennessee Medicaid School-Based Services;

Virginia: Danville Public Schools;

Montgomery Public Schools.

PCG is causing the local education agencies in each of these states to submit false claims to Medicaid for federal funds to pay for IEP meetings and other services that do not qualify for federal Medicaid reimbursement.

### FIRST CAUSE OF ACTION
**(31 U.S.C. §§ 3729(a) (1), (2) and (3))**
**(Defendant Public Consulting Group, Inc.)**

46.     Relator incorporates by reference paragraphs 1 through 45 of this Complaint, as if set forth fully herein.

47.     Defendant Public Consulting Group, Inc., by submitting claims to Medicaid arising out of IEP meetings for which there was no medical component (a) knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government; and (c) conspired with others to defraud the United States Government by getting false and fraudulent claims allowed or paid, in that Defendants made or caused false claims to be made to the Medicaid program, all in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3).

48.     As a result of this false and fraudulent conduct the United States Government was damaged in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**(31 U.S.C. §§ 3729(a) (1), (2) and (3))**
**(All Local Education Agency Defendants)**

49.     Relator incorporates by reference paragraphs 1 through 48 of this Complaint, as if set forth fully herein.

50.     The Local Education Agency Defendants, by submitting claims to Medicaid arising out of IEP meetings for which there was no medical component (a) knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government; and (c) conspired with others to defraud the United States Government by getting false and fraudulent claims allowed or paid, in that Defendants made or caused false claims to be made to the Medicaid program, all in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3).

51.     As a result of this false and fraudulent conduct the United States Government was damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself individually, and acting on behalf, and in the name, of the Government of the United States demands and prays that judgment be entered against the Defendants as follows:

a.      That the Defendants shall be ordered to cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-3732.

b.      On the First Cause of Action under the False Claims Act, judgment shall be entered against Defendant Public Consulting Group, Inc. in the amount of three times the amount of damages the United States has sustained because of the actions of Defendants Public Consulting Group, Inc., plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest.

        c.      On the Second Cause of Action under the False Claims Act, judgment shall be entered against the Local Education Agency Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest.

        d.      That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the United States declines to intervene.

        e.      That Relator shall be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by the False Claims Act, 31 U.S.C. § 3730(d).

        f.      And, such other relief shall be granted in the favor of the United States and the Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator

hereby demands trial by jury.

Dated: April 23, 2012

Respectfully submitted,

MENZ BONNER KOMAR & KOENIGSBERG LLP

By: _____
Patrick D. Bonner, Jr.

125 Half Mile Road, Suite 103
Red Bank, New Jersey 07701
Tel.: (732) 758-1200
Fax: (732) 758-1204
Email: pbonner@mbkklaw.com

David A. Koenigsberg
(Not Admitted in New Jersey)
MENZ BONNER KOMAR & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
Tel.: (212) 223-2100
Fax: (212) 221-2185
Email: dkoenigsberg@mbkklaw.com

*Attorneys for Relator Shane Shackford*

## APPENDIX A

## DEFENDANT NEW JERSEY LOCAL EDUCATION AGENCIES

| |
|---|
| **Atlantic County** |
| Egg Harbor Township |
| Galloway Township |
| |
| **Atlantic County** |
| Egg Harbor Township |
| Galloway Township |
| Buena Regional |
| Galloway TWP |
| Hamilton  TWP |
| Pleasantville City |
| Somers Point City |
| |
| **Bergen County** |
| Bogota Boro |
| Dumont Boro |
| Lodi Borough |
| Lyndhurst TWP |
| Ridgefield Park |
| |
| **Burlington County** |
| Burlington TWP |
| Delran TWP |
| Lumberton TWP |
| Maple Shade TWP |
| Moorestown TWP |
| Mount Holly TWP |
| Mount Laurel TWP |
| Pemberton TWP |
| |
| **Camden County** |
| Clementon Boro |
| Gloucester City |
| Gloucester TWP |
| Lindenwold Boro |
| Mount Ephraim Boro |
| Pennsauken TWP |
| Runnemede Boro |
| Waterford TWP |
| Woodlynne |

| |
|---|
| **Cape May County** |
| Dennis TWP |
| Lower TWP |
| |
| **Cumberland County** |
| Bridgeton City |
| Downe TWP |
| Upper Deerfield TWP |
| |
| **Essex County** |
| Belleville Town |
| City of Orange TWP |
| Irvington Township |
| Lady Liberty Academics |
| Montclair Town |
| Team Academy Charter SCHO |
| West Orange Town |
| |
| **Gloucester County** |
| Elk TWP |
| Glassboro |
| Monroe TWP – Gloucester CO |
| Paulsboro BORO |
| Woodbury City |
| |
| **Hudson County** |
| Bayonne City |
| Harrison Town |
| Hoboken City |
| Hudson County Voc. |
| Jersey City |
| Kearny Town |
| Learning Community |
| North Bergen TWP |
| Secaucus Town |
| Union City |
| West New York Town |

| |
|---|
| **Hunterdon County** |
| Kingwood TWP |
| |
| **Mercer County** |
| East Windsor Regional |
| Ewing TWP |
| Lawrence TWP |
| |
| **Middlesex County** |
| Dunellen Boro |
| East Brunswick TWP |
| Middlesex Boro |
| Middlesex CO Vocational |
| New Brunswick City |
| North Brunswick TWP |
| Old Bridge TWP |
| Perth Amboy City |
| Piscataway TWP |
| Sayreville Boro |
| South Brunswick TWP |
| South Plainfield Boro |
| South River Boro |
| Spotswood Boro |
| Woodbridge TWP |
| |
| **Monmouth County** |
| Asbury Park City |
| Belmar |
| Eatontown Boro |
| Freehold Boro |
| Hazlet TWP |
| Holmdel TWP |
| Howell TWP |
| Keansburg Borough |
| Keyport Boro |
| Long Branch City |
| Middletown TWP |
| Neptune TWP |
| Ocean TWP |

| |
|---|
| **Morris County** |
| Boonton Town |
| Butler Boro |
| Morris School District |
| Mount Olive TWP |
| |
| **Ocean County** |
| Brick TWP |
| Lakehurst Boro |
| Lakewood TWP |
| Manchester TWP |
| Plumsted TWP |
| Point Pleasant |
| Souther Regional |
| Stafford TWP |
| |
| **Passaic County** |
| Bloomingdale Boro |
| Clifton City |
| Little Fall TWP |
| Passaic City |
| Passaic County Vocational |
| Prospect Park Boro |
| Totowa |
| West Milford TWP |
| |
| **Salem County** |
| Salem City |
| Woodstown Pilesgrove |
| |
| **Somerset County** |
| Sound Brook Boro |
| Somerville Boro |
| |
| **Sussex County** |
| Montague TWP |
| Stillwater TWP |
| Sussex Wantage Regl. |
| |
| **Union County** |
| Elizabeth City |
| Hillside TWP |

| |
|---|
| Linden City |
| Plainfield City |
| Rahway City |
| Roselle Boro |
| Roselle Park Boro |
| Scotch Plains-Fanwood |
| Summit City |
| Union TWP |
| **Warren County** |
| Lopatcong TWP |
| Mansfield |